IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY MUSTAFA LIFE WILLIAMS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-CV-3511 |
| | : | |
| WARDEN KYLE RUSSELL, *et al.*, | : | |
| Defendants. | : | |

<u>MEMORANDUM OPINION</u>

Goldberg, J.                                                              February 10, 2022

Plaintiff Anthony Mustafa Life Williams, proceeding *pro se*, brings claims arising out of various incidents at Lehigh County Jail, where he is incarcerated.  He names as Defendants multiple prison officials, including Warden Kyle Russell, Deputy Steven Miller, Deputy Robert McFadden, Lieutenant Michael Dailey, Sergeant John Zuber, Sergeant K. Kowal, Correctional Officer ("C.O.") Alex Watty, C.O. S. Hornick, C.O. Gary Dean, C.O. Thomas Holler, C.O. Drew Woodard, and C.O. Jeff Henning (misidentified as Hennie) (collectively, the "Prison Defendants"), as well as fellow inmate Duane Quonnis.

The Prison Defendants previously moved to dismiss the Amended Complaint's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  I granted the motion in part and denied the motion in part, and gave Plaintiff leave to file a second amended complaint correcting any deficiencies.  Thereafter, Plaintiff filed the Second Amended Complaint, and the Prison Defendants filed a second Motion to Dismiss.  For the following reasons, I will grant this Motion in part and deny it in part.

I.    FACTUAL BACKGROUND

The following facts are taken from the Second Amended Complaint: [1]

---

[1]    In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), I must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff,

A. <u>Events of July 16, 2019</u>

According to the Second Amended Complaint, Plaintiff was a pretrial detainee between February 7, 2019 and February 7, 2020. (Sec. Am. Compl. ¶ 1.)

On July 16, 2019, while on the phone in Block 2A, a nonviolent block on the second floor of the prison, Plaintiff was "disrespected and taunted" by inmate James Gatling. After seeing other inmates taking notice of Gatling's words, and fearing that his life could be in danger unless Gatling's behavior was addressed, Plaintiff got off the phone and "tried to get inmate Gatling to discontinue his taunting and his disrespective behavior through talking to him." The talk turned into an argument, at which point Defendant Correctional Officer Dean came over and told Plaintiff that he "better stay out of his friend's face or that [he] would have a problem." Plaintiff, in turn, told Dean to tell Gatling to stop with the taunting or he would have a problem. Gatling called Plaintiff a snitch, and Plaintiff walked back to the phone. (<u>Id.</u> ¶¶ 2–3.)

Dean then followed Plaintiff and directed him to get the "f**k off the phone." Plaintiff told his friend who was on the phone that "I will call you later, I'm about to knock this C.O. out." Plaintiff claims that he did this to save face in front of other inmates. Plaintiff hung up and walked towards Dean, asking him why he was taking things personally. At that time, Dean stated to another C.O. that, "I will show this motherf***er what our gang is about?" Out of nowhere, Dean punched Plaintiff in the throat. Plaintiff swung to prevent further assault and hit Dean in the eye, while Dean punched him in the ribs. (<u>Id.</u> ¶¶ 5–7.)

At that point, Defendants Sgt. Zuber, Sgt. Kowal, Lt. Dailey and C.O. Dean all attacked Plaintiff. Plaintiff was sprayed in the face with a defensive spray by Sgt. Kowal, pushed to the ground, and tightly handcuffed behind his back. Sgt. Zuber, C.O. Watty, and C.O. Hornick escorted him to the third floor hole. All of this was captured on the prison camera system. (<u>Id.</u> ¶ 9.)

---

and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. <u>Atiyeh v. Nat'l Fire Ins. Co. of Hartford</u>, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010)."

Once in the hole, Plaintiff was placed in a chair in the hallway, which is an area free of cameras. Sgt. Kowal arrived, opened a locker, and handed out CERT (Correctional Emergency Response Team) padded gloves to the staff present. Sgt. Kowal then ordered Plaintiff to stand up. Plaintiff stood, still handcuffed, and Sgt. Kowal punched him in the stomach, asking "did [he] like hitting a member of their gang?" Sgt. Zuber punched Plaintiff in the back of the head, and Plaintiff fell to the ground. While on the ground, Sgt. Zuber took "some hand held device" out of the locker and held it to Plaintiff's right arm, shocking him with electricity. Sgt. Kowal, Sgt. Zuber, C.O. Watty, and C.O. Hornick then proceeded to punch and kick Plaintiff in the head, back, legs, and arms repeatedly. At some point, their supervisor, Lt. Dailey, came in, saw what was happening, kicked Plaintiff in the shin, and said to remember Deputy Warden McFadden's orders, "no marks." (Id.) Finally, Sgt. Kowal started choking Plaintiff, causing him to black out until Sgt. Dailey said, "enough." (Id. ¶¶ 12–16.)

Plaintiff awoke to Sgt. Kowal slapping him in the face. Defendants Watty and Hornick stood Plaintiff up and fixed his clothes, and Watty told him to straighten up or he would get more. He was taken to his cell, and a nurse came on the block to "decontaminate" him. (Id. ¶ 17.)

The next day, Plaintiff's criminal defense attorney came to visit him in relation to another criminal matter. Plaintiff showed him the bruises, and the attorney said he would send an investigator. On July 18, 2019, an investigator came from the Public Defender's office to take photos, but he was told by Deputy Warden McFadden that he would not be able to do so. (Id. ¶ 18.)

Plaintiff alleges that, to date, there are still no cameras in the hall where he was beaten. He claims that he has witnessed several assaults against inmates happened there, and that Deputy Warden McFadden, as head of security, has witnessed and participated in assaults in this area. According to Plaintiff, McFadden has purposefully kept this area a "blind spot" from the cameras. Further, Plaintiff alleges that McFadden directly controls and directs Defendants Dailey, Kowal, and Zuber to assault inmates, and then attempts to cover up these actions. (Id. ¶¶ 21–22.)

**B.**     <u>Events of June 2020</u>

On June 24, 2020, around 8:00 p.m., in the security maximum section of the prison, Plaintiff and two inmates, Taiton Edwards and Duane Quonnis—both known, dangerous gang members—were yelling through their cell door at Plaintiff, threatening him.  Neither C.O. Woodard nor C.O. Holler, both of whom were present, wrote any misconducts.  (<u>Id.</u> ¶¶ 24–26.)

Once locked in his cell, Plaintiff heard Holler tell Edwards and Quonnis, "he likes to assault guards, so he should be assaulted."  Quonnis said to Holler and Woodard, "don't worry I got him tomorrow."  Edwards then said, "if I see him upstate, I will stab him and if I see him in the tail, I will get him, you know C.O. Dean is my boy."  In response, Holler said, "Don't worry, I'll make sure you will get your job back and you won't lose anything."  (<u>Id.</u>)  Woodard and Holler failed to do anything to stop this potential assault.  (<u>Id.</u> ¶¶ 27–29.)

The next day, June 25, 2020, while Plaintiff was on the law library computer, C.O. Jeff Henning, who was escorting Quonnis, a known security alert, "deliberately failed to have two hands on the inmate, as he was trained to do," and escorted him with only one hand.  Quonnis, who was handcuffed with his hand in front, broke free and ran to attack Plaintiff, who was also handcuffed.  C.O. Henning failed to prevent the attack, and it was not until Quonnis struck Plaintiff in his head, splitting it open, did Henning try to restrain Quonnis.  (<u>Id.</u> ¶¶ 30–31.)

On the 3:00 p.m. shift on June 25, 2020, Plaintiff heard Defendant Holler congratulate Quonnis, and tell Edwards he better keep his word of stabbing Plaintiff.  Holler gave Quonnis a tablet and a shower in reward for his attack.  (<u>Id.</u> ¶ 34.)

Defendants Russell, Miller, and McFadden were all in charge of overseeing the operation of Blocks 3C1 and 3C2.  Prior to the attack on June 25, 2020, other inmates were also attacked by other high risk, security alert prisoners in maximum custody.  Yet these three Defendants failed to implement policies to (a) make guards handcuff prisoners behind their backs when escorting them out of their cell, (b) ensure guards wrote misconducts when they heard of threats against other inmates, or (c) require that

4

guards inform other shifts of possible problems.  According to Plaintiff, inmates attacks have been going on for years at Lehigh County Jail, yet Defendants Russell, Miller, and McFadden deliberately disregarded these problems and failed to take any action to ensure the safety of the other inmates. Defendants Russell, Miller, and McFadden also purportedly failed to ensure staff was properly trained to address risk matters despite knowing that the current policies and training were inadequate.  (Id. ¶ 38.)  Indeed, Plaintiff alleges that prior to the June 25, 2020 assault, Defendants Russell, Miller, and McFadden knew Plaintiff's life was in danger due to several grievances he wrote.  His complaints went uninvestigated, his request for transfer was denied, and his grievances were dismissed.  (Id. ¶¶ 35–39.)

### C.  Conditions of Confinement Claim

Plaintiff alleges that Defendants Russell, McFadden, and Miller were made aware of the following conditions of confinement through staff, request slips, and grievances by Plaintiff and other inmates, yet failed or refused to adequately address these conditions:

- To punish inmates for going to the hole, clothing is reduced.  In population, inmates get multiple uniforms, pairs of underwear, socks, etc.  Once in the hole, those items are significantly reduced, books are removed, and inmates must wear short-sleeved jumpsuits.

- When going to the yard, which allows air, rain, and sunlight through, inmates are only allowed to wear shower shoes.  As a result, many often refuse the yard and stay in their cells for twenty-four hours.

- Since being in Block 3C, there has been an increase in the mouse infestation.

- Inmates in 3C get mats, not mattresses, and at least 90% of them are ripped and dirty.

- Showers in 3C have black mold.  No regular cleaning of showers is done.

- Food is used as a punishment.  On 3C, inmates are not given milk or juice, and they are given oil-based cheese and canned fruit.  Often, the bread is placed on top of the canned fruit, which makes the bread soggy and inedible.  At least three times a week, inmates are fed eggs and raw potatoes.  Beans are served five times month, and many times they are raw.  Portion sizes are far too small to satisfy anyone.

- Inmates are not given adequate cleaning supplies to clean their cells and, thus, they are subjected to cells with urine and feces on the walls from years past.

(Id. ¶¶ 42–52.)

### D. Discrimination Claims

Plaintiff alleges that Lehigh County Jail, under the direction of the above Defendants, has a discriminatory policy in place.  Once male inmates are placed on 3C, they are immediately punished through clothing reduction, while females are not.  Likewise, transgender inmates who go to 3C are not required to give up their clothing and are allowed to wear towels and t-shirts to the shower, while non-transgender inmates are not.  Plaintiff asserts that while "[t]he policy of allowing women and transgender inmates to go to the shower with tee shirts may prevent them from being sexually harassed," Plaintiff "and other non-female and non-transgender males also are sexually harassed."  (Id. ¶¶ 55–58.)

### E. Procedural History

On June 4, 2020, Plaintiff filed his Complaint alleging state law claims of assault and battery, as well as claims under 42 U.S.C. § 1983 for excessive force, denial of access to courts, and violations of his First and Fourteenth Amendment rights.  On August 18, 2020, Plaintiff filed an "Amended Complaint" setting forth additional claims related to the June 2020 incident.

On March 1, 2021, the Prison Defendants moved to dismiss the claims against them.  I granted Defendants Motion as to the conditions of confinement claim against Defendant Russell, the First Amendment claim, the Equal Protection Clause claim, and the state law claims against Defendants Miller, Russell, McFadden, and Henning.  I also granted Plaintiff leave to file a second amended complaint.

Plaintiff timely filed the Second Amended Complaint alleging:  (1) excessive force and assault and battery against Defendant Dean; (2) excessive force, assault and battery, and conspiracy against Defendants Dailey, Zuber, Kowal, Watty, Hornick, and McFadden; (3) failure to protect, conspiracy, assault and battery, and negligence against Defendants Holler, Woodard, Quonnis, and Henning; (4) failure to protect and Eighth Amendment violations against Defendants Russell, McFadden, and Miller; (5) conditions of confinement violations against Defendants Russell, McFadden, and Miller; and (6)

6

discrimination in violation of the Fourteenth Amendment against Defendants Russell, McFadden, and Miller.  The Prison Defendants again moved to dismiss.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679).  The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. (quoting Iqbal, 556 U.S. at 679).

A prisoner's *pro se* complaint should be "held to less stringent standards than formal pleadings drafted by lawyers."  U.S. ex rel. Walker v. Fayette Cnty., Pa., 599 F.2d 573, 575 (3d Cir. 1979), (citing Haines v. Kerner, 404 U.S. 519, 521 (1972)).  The court must construe the facts stated in the complaint

liberally in favor of the plaintiff.  Haines, 404 U.S. at 520.  "Yet there are limits to our procedural flexibility.  For example, *pro se* litigants still must allege sufficient facts in their complaints to support a claim."  Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013).  Thus, even a *pro se* complaint must conform with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertions" that are devoid of "factual enhancement."  Iqbal, 556 U.S. at 678 (internal quotations omitted).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do."  Id.

## III.    DISCUSSION

### A.  Claims Against Defendant Dean

Plaintiff sets forth claims against Defendant Dean for excessive force, assault, and battery.  In the interim, however, Dean has passed away from COVID-19.  Accordingly, the Prison Defendants urge that all claims against Dean must be dismissed.  Alternatively, Defendants contend that Dean has immunity on the state  law claims.

### 1.    Whether Dean's Death Extinguishes the Claims Against Him

Federal law and, in particular, 42 U.S.C. § 1983 does not speak to the survival of a civil rights action upon the death of the defendant.  In Robertson v. Wegmann, 436 U.S. 584 (1978), the United States Supreme Court held that "the decision as to the applicable survivorship rule is governed by 42 U.S.C. § 1988," which "recognizes that in certain areas federal law is unsuited or insufficient to furnish suitable remedies; federal law simply does not cover every issue that may arise in the context of a federal civil rights action."  Id. at 588 (internal quotations and quotation markes omitted).  "When federal law is thus 'deficient,' § 1988 instructs us to turn to the common law, as modified and changed by the constitution and statutes of the [forum] State, as long as these are not inconsistent with the Constitution and laws of the United States."  Id.

Accordingly, state law governs whether the § 1983 excessive force claim and the state assault and battery claims survive Defendant Dean's death. Pennnsylvania law speaks clearly on this subject. Under 42 Pa. Cons. Stat. § 8302, "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff *or of the defendant*, or the death of one or more joint plaintiffs or defendants." Id. (emphasis added).

In light of that unequivocal statement, I find that the claims against Dean are not extinguished by his death. This begs the question of how to proceed. Federal law governs the procedure for substutitution following a party's death. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, substitution of parties in a civil action may be allowed upon the death of a named party:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

Fed. R. Civ. P. 25 (emphasis added). It is well settled that when a defendant in a § 1983 action dies, the proper party to substitute is the successor of the deceased or the representative of his estate. See Graham v. Henderson, 224 F.R.D. 59, 64 (N.D.N.Y. 2004).

Here, neither party has filed a suggestion of death upon the record.[2] Accordingly, the time for filing a motion for substitution has not been triggered and any such motion, or dismissal for lack of substitution, would be premature. Accordingly, I will deny this portion of the Motion to Dismiss.

---

[2]   Under the Federal Rules of Civil Procedure, any party or their counsel may file a "suggestion of death" with the Court. The suggestion of death must also be served on the parties pursuant to Rule 5 and on the estate of the deceased pursuant to Rule 4. Giles v. Campbell, 698 F.3d 153, 158 (3d Cir. 2012) After the suggestion of death is properly filed and served, a 90-day countdown begins, at which time some other party or the executor or administrator of the deceased must move for substitution of the estate for the deceased. See McKenna v. Pacific Rail Serv., 32 F.3d 820, 836 (3d Cir. 1994).

### 2.    Whether Dean is Immune from the State Law Claims

The Prison Defendants also assert that, to the extent Plaintiff brings claims under Pennsylvania state law against Dean, those claims are barred by the Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. §§ 8501 et seq.  They posit that even if Plaintiff attempted to seek an exception to immunity under a theory of willful misconduct, the Second Amended Complaint's averments are legally insufficient.

Pennsylvania's Political Subdivision Tort Claims Act  ("PSTCA")  states  that  "[e]xcept  as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa. Cons. Stat. § 8541. This limitation extends to an employee of a local agency to the extent his acts were within the scope of his office or duties. Id. § 8545. Immunity is abrogated for negligent acts falling into one of eight proscribed categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals.  Id. § 8542(b).

Where the alleged torts are intentional acts, however, section 8550 permits actions against governmental employees who by their misdeeds are determined to have "caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. The United States Court of Appeals for the Third Circuit has recognized that "[e]mployees are not immune  from liability under § 8545 where their conduct amounts to 'actual malice' or 'willful misconduct.'" Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006). "Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such a desire can be implied.'  Otherwise  stated,  the  term  'willful  misconduct'  is  synonymous  with  the  term 'intentional tort.'"  Id. (quoting Renk v. City of Pittsburgh, 641 A.2d 289 (Pa. 1994)).

10

Plaintiff has plausibly pled willful misconduct by Defendant Dean.  According to the Second Amended Complaint, just prior the physical confrontation between Plaintiff and Dean, Dean stated "I will show this motherf***er what our gang is about."  (Sec. Am. Compl. ¶ 7.)  Plaintiff then turned towards another inmate, and allegedly out of nowhere, Dean punched Plaintiff in the throat.  When Plaintiff swung to prevent further assault, Dean punched him in the ribs.  (Id. ¶ 7.)  At that point Dean and several other officers attacked Plaintiff.  (Id. ¶ 9.)  Such allegations, taken as true and in the light most favorable to Plaintiff, allow the plausible inference that Dean acted with an intent to cause harm to Plaintiff.  As such, and at this early stage of the litigation, I cannot find that Defendant Dean is immune from suit on the state law claims.

### B.  Excessive Force and State Law Claims Against Defendants Dailey, Henning Zuber, Kowal, Watty, Hornick, and McFadden

As I noted in my prior Memorandum Opinion, for a pretrial detainee to state an excessive force claim against a prison official, he must allege that the force used was applied "maliciously and sadistically to cause harm" and not "in a good-faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. 1, 6 (1992).  The factors relevant to this inquiry include "the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  Id.  at 7.  An inmate does not have to show that the harm suffered was sufficiently serious in order to make out a constitutional violation where excessive force was used, and absence of serious injury does not end the inquiry.  Id. at 8; see also Brooks v. Kyler, 204 F.3d 102, 104 (3d Cir. 2000) ("Following Hudson's focus on the force used, as opposed to the injury inflicted, we conclude that although the degree of injury is relevant for any [constitutional violation] analysis, there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for wanton and excessive force").

The Prison Defendants move to dismiss the excessive force claims against Defendants Dailey, Henning, Zuber, Kowal, Watty, Hornick, and McFadden.  The Prison Defendants also assert that, to the extent Plaintiff fails to allege willful misconduct by these Defendants, they are immune, under the PSTCA, from the state law claims.

### 1.    Defendant Henning

The Second Amended Complaint alleges that, on June 25, 2020, C.O. Jeff Henning, knowing that he was escorting Quonnis, a dangerous inmate, "deliberately failed to have two hands on the inmate, as he was trained to do, escorted him with only one hand."  (Id. ¶ 30.)  Quonnis broke free and attacked Plaintiff.  (Id.)  C.O. Henning failed to prevent the attack, and it was not until Quonnis struck Plaintiff in his head that Henning try to restrain Quonnis.  (Id. ¶ 31.)

These allegations are similar to the ones put forth in the previous iteration of the Complaint.  I dismissed the excessive force claim finding that the claims against Henning sounded in mere negligence, which is not a sufficient basis on which to impose § 1983 liability.  As nothing in the Second Amended Complaint corrects this deficiency, I will dismiss the excessive force claim against Henning with prejudice.

Likewise, I find that Plaintiff has failed to plead willful misconduct by Henning.  As such, the state law claims against Henning must also be dismissed under PSTCA's immunity.

### 2.    Defendants Dailey, Zuber, Kowal, Watty, and Hornick

The Prison Defendants next argue that the excessive force claims against Dailey, Zuber, Kowal, Watty, and Hornick must fail.  They assert that Plaintiff has admitted to being a known threat to corrections officers, being involved in an altercation that was escalating physically, threatening to knock out a corrections officer, and moving in a threatening fashion towards a corrections officer.  Under these circumstances, the Prison Defendants contend that the actions of Dailey, Zuber, Kowal, Watty, and Hornick constitute reasonable reactions that do not violate Plaintiff's constitutional rights and, therefore, are not actionable under § 1983.

Liberally construing the allged facts in the light most favorable to Plaintiff, I find that Plaintiff has alleged a plausible claim of excessive force against these Defendants.  According to the Second Amended Complaint, Plaintiff was taken into "the hole" and placed in a hallway free of cameras.  Sgt. Kowal arrived, opened a locker, handed out CERT team padded gloves to those staff present, and ordered Plaintiff, who was still handcuffed, to stand up.  Sgt. Kowal then punched him in the stomach and asked, "did [he] like hitting a member of their gang?"  Sgt. Zuber punched Plaintiff in the back of the head, and Plaintiff fell to the ground.  While on the ground, Sgt. Zuber took "some hand held device" out of the locker and held it to Plaintiff's right arm, shocking him with electricity.  Sgt. Kowal, Sgt. Zuber, C.O. Watty, and C.O. Hornick then proceeded to punch and kick Plaintiff in the head, back, legs, and arms repeatedly.  At some point, Lt. Dailey, their supervisor, came in, saw what was happening, kicked Plaintiff in the shin, and said to remember Deputy Warden McFadden's orders, "no marks."  Finally, Sgt. Kowal started choking Plaintiff, causing him to black out.  Plaintiff awoke to Sgt. Kowal slapping him in the face.  Defendants Watty and Hornick stood him up and fixed his clothes, and Watty told him to straighten up or he would get more.  (Sec. Am. Compl. ¶¶ 13–17.)

Taking these allegations as true, there is an inference that the use of force was not justified or based on a reasonably perceived threat.  Likewise, Plaintiff plausibly pleads that there was no reasonable relationship between the need and the amount of force used.[3]  Accordingly, I decline to dismiss this claim.

---

[3]     In support of their Motion, Defendants cite to the Third Circuit decision in <u>Reyes v. Chinnici</u>, 54 F. App'x 44 (3d Cir. 2002), a case raised in their prior Motion to Dismiss.  In <u>Reyes</u>, the prisoner plaintiff alleged a claim of excessive force against a correctional officer.  <u>Id.</u> at 46.  Applying the above factors, the district court granted summary judgment in favor of the defendant, noting that the plaintiff admitted that he was a "security status" inmate, that he attempted to spit on the defendant, the defendant struck the plaintiff once in the shoulder and not in the head or face, the purpose of the defendant's reaction was to avoid being spit on, the resulting injury was minor and temporary, and the correction officers then immediately placed the plaintiff back in his cell without further incident.  <u>Id.</u> at 47.  The Third Circuit affirmed the grant of summary judgment finding that "[a] single punch to avoid being spit upon is not the sort of action that is 'repugnant to the conscience of mankind'" and, therefore was not a constitutional violation.  <u>Id.</u>

As to these Defendants' claim of immunity under the PSTCA, I find that Plaintiff has plausibly pled willful misconduct by these Defendants, thereby invoking the PSTCA's exception. Therefore, I will not dismiss the state law claims against them.

### 3. Defendant McFadden

The Prison Defendants next move to dismiss the § 1983 excessive force claim against Defendant Deputy Robert McFadden, arguing that Plaintiff has failed to set forth any allegations showing McFadden's personal involvement.

In order to prevail on a § 1983 claim against a supervisor, a plaintiff must show either that (1) the supervisor directly participated in violating a plaintiff's constitutional rights, (2) that he directed others to do so, or (3) as the officer in charge, the supervisor had knowledge of and acquiesced in constitutional violations committed by subordinates. Zimmerman v. Schaeffer, 654 F. Supp. 2d 226, 253 (M.D. Pa. 2009) (citing Beers–Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001)). A plaintiff may also establish supervisory liability by showing that a supervisor tolerated past or ongoing misbehavior by subordinates:

> The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001).

The Second Amended Complaint sufficiently alleges supervisory liability against Defendant McFadden. Plaintiff asserts that, after his beating on July 16, 2019, McFadden prevented an

---

As I stated in my previous Memorandum Opinion, I do not find the Prison Defendants' argument or their citation to Reyes convincing. Reyes was decided at summary judgment after full discovery on the issue, whereas here I must take the facts of the Second Amended Complaint as true. Moreover, the violence at issue in Reyes involved a single punch and was far less shocking than the extensive beating alleged here.

investigator—sent by Plaintiff's criminal defense attorney—from taking pictures of Plaintiff's bruises. Plaintiff further asserts that McFadden knew that assaults would happen in the hallway where Plaintiff was beaten, has witnessed and participated in assaults in this area, and has purposefully kept this area a "blind spot" from the cameras.  Finally, Plaintiff alleges that McFadden directly controls and directs Defendants Dailey, Kowal, and Zuber to assault inmates, and then attempts to cover up these actions. Based on such allegations, the Prison Defendants' Motion to Dismiss these claims will be denied.

To the extent Plaintiff means to assert state law assault and battery claims[4] against Defendant McFadden, however, the Second Amended Complaint is devoid of any allegations that McFadden was present for and participated in Plaintiff's alleged beating.  Therefore, these claims must be dismissed.

**C.**    **Conditions of Confinement Claim Against Defendant Russell**

Plaintiff also brings a § 1983 claim challenging his conditions of confinement against Defendants McFadden, Miller, and Russell.  The Prison Defendants move to dismiss this claim against only Defendant Russell, asserting that the Second Amended Complaint contains no averments showing his personal involvement or deliberate indifference.

"A pretrial detainee's protection from punishment under the Fourteenth Amendment has been distinguished from a convicted prisoner's protection from punishment that is 'cruel and unusual' under the Eighth Amendment."  Hall-Wadley v. Maintenance Dept., 386 F. Supp. 3d 512, 516 (E.D. Pa. 2019). The Third Circuit has held that pretrial detainees "are entitled to greater constitutional protection than that provided by the Eighth Amendment."  Hubbard v. Taylor, 399 F.3d 150, 167 n.23 (3d Cir. 2005). When a pre-trial detainee claims that the conditions of confinement violate his due process rights, "the proper inquiry is whether those conditions amount to punishment of the detainee."  Bell v. Wolfish, 441 U.S. 520, 535 (1979).   The United States Supreme Court established a two-prong standard for

---

[4]     Under Pennsylvania law, "[a]n assault is an intentional attempt by force to do an injury to the person of another."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (quotation omitted).  "[A] battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  Id.

determining whether conditions of confinement violate Due Process: whether the questioned "restrictions and practices" (1) "are rationally related to a legitimate nonpunitive governmental purpose[,]" and (2) "whether they appear excessive in relation to that purpose." Id. at 561.

As noted above, to prevail on a Fourteenth Amendment claim brought pursuant to § 1983, a pretrial detainee must also demonstrate that a particular defendant acted with "deliberate indifference" to those conditions. Edwards v. Northampton Cnty, 663 F. App'x 132, 135 (3d Cir. 2016). Deliberate indifference is established if a defendant "knows that inmates face a substantial risk of serious harm" and "disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).

In my prior Memorandum Opinion, I found that Plaintiff had plausibly pled that the problematic conditions—all of which include denial of food, clothing, shelter, and sanitation—constituted "punishment" not rationally related to a legitimate governmental purpose. Moreover, I held that Plaintiff had adequately pled deliberate indifference on the part of Defendants McFadden and Miller by alleging that they were aware of the conditions and condoned them. I concluded, however, that Plaintiff had failed to allege any personal involvement or deliberate indifference by Warden Russell and, therefore, dismissed the claim against him.

The Second Amended Complaint has corrected this deficiency. Plaintiff now alleges that Defendants Russell, McFadden, and Miller were made aware of the identified conditions "through staff, request slips and grievances by plaintiff and other inmates." (Sec. Am. Compl. ¶ 42.) Yet, according to Plaintiff "all Defendants while in a position to do so, failed to adequately address or and refuse to address, deliberately, the risk that these conditions posed to plaintiff and other inmates." (Id.) In light of these allegations, which directly implicate Russell, I will deny the Prison Defendants' Motion.

**D.     Equal Protection Claim Against Defendants Russell, McFadden, and Miller**

In the prior Memorandum Opinion, I dismissed Plaintiff's equal protection claim, finding that Plaintiff had not plausibly pled that the differential treatment between male inmates, on one hand, and

female and transgender inmates on the other, was the result of intentional or purposeful discrimination. I also noted that Plaintiff had failed to set forth any basis to find that the distinction in treatment was not reasonably related to legitimate penological interests caused by biological differences between males and females.  See Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) (noting that an equal protection violation in a prison setting requires proof that an inmate "was treated differently than others similarly situated as a result of intentional or purposeful discrimination . . . . He must also show that the disparity in treatment cannot survive the appropriate level of scrutiny, which, in a prison setting, means that [a plaintiff] must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests.") (internal citation and quotation marks omitted); see also Robinson v. Superintendent Houtzdale SCI, 693 F. App'x 111, 118–19 (3d Cir. 2017).

Plaintiff's attempt to replead this claim fares no better.  Indeed, I find that this claim suffers from the same deficiencies as those identified in the Amended Complaint.  As such, I will dismiss this claim with prejudice.

## IV.    CONCLUSION

For the reasons set forth above, I will grant in part and deny in part the Motion to Dismiss.  All remaining Defendants will have twenty-one days in which to file an Answer to the Second Amended Complaint.  An appropriate Order follows.