# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY MUSTAFA LIFE WILLIAMS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-CV-3511 |
| | : | |
| WARDEN KYLE RUSSELL, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                                    **May 15, 2024**

Plaintiff Anthony Mustafa Life Williams, proceeding *pro se*, brings claims arising out of various incidents at Lehigh County Jail, where he was incarcerated during the relevant time period.  Defendants include multiple prison officials, including Warden Kyle Russell, Deputy Steven Miller, Deputy Robert McFadden, Lieutenant Michael Dailey, Sergeant John Zuber, Sergeant K. Kowal, Correctional Officer ("C.O.") Alex Watty, C.O. Jeff Henning, C.O. S. Hornick, C.O. Gary Dean, C.O. Thomas Holler, and C.O. Drew Woodard (collectively, the "Prison Defendants"), as well as fellow inmate Duane Quonnis.[1]

The Prison Defendants have moved for summary judgment on all remaining claims.  For the following reasons, I will grant the Motion in part and deny it in part.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' statements of undisputed facts and the accompanying exhibits.[2]

---

[1]      Defendants refer to inmate Duane Quonnis as "Quinones."  For the sake of consistency, I will use the spelling provided by Plaintiff in his Second Amended Complaint.

Although Plaintiff named Quonnis as a defendant and was granted leave to serve him by alias summons, it does not appear that Quonnis was ever actually served in this matter.  As more than two years have passed and Plaintiff has made no additional efforts to either effectuate service or seek default against Quonnis, I will dismiss all claims against him without prejudice.

[2]      To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the

A. **Events of July 16, 2019**

According to the Second Amended Complaint, Plaintiff was a pretrial detainee at the Lehigh County Jail between February 7, 2019 and February 7, 2020.  (Sec. Am. Compl. ¶ 1.)  Plaintiff claims that, on July 16, 2019, while talking on the phone in Block 2A, made up of general population, Plaintiff was "disrespected and taunted" by another inmate.  (Id. ¶¶ 2–3.)  Plaintiff started to argue with the other inmate.  (Def.'s Ex. A, Surveillance Video of July 16, 2019.)  At the same time, Defendant Gary Dean, a correctional officer at the prison, was escorting the medical nurse through the same room.  (Defendant's Statement of Undisputed Facts ("DSUF") ¶ 8; Def.'s Ex. B.)    Officer Dean confronted Plaintiff about the argument and told Plaintiff to get off the phone, but Plaintiff refused.  (DSUF ¶ 9.)  Plaintiff told his friend who was on the phone that "I will call you later, I'm about to knock this C.O. out."  (Sec. Am. Compl. ¶ 6.)

The video surveillance of this event showed Plaintiff in general population talking on a phone attached to a wall.  When a particular inmate walked by, without saying anything to Plaintiff, Plaintiff dropped the phone and started angrily yelling in that inmate's face.  (Def.'s Ex. A.)  Officer Dean, from a reasonable distance, confronted Plaintiff about his behavior, and Plaintiff returned to his phone call.  (Id.)  As Officer Dean continued to say something to Plaintiff, Plaintiff again dropped the phone and started charging at Dean with his fists in the air.  (Id.)  Although Dean appeared to throw the first punch, Plaintiff maintained an aggressive stance.  (Id.)  The two men scuffled until multiple other guards interceded to bring Plaintiff to the ground face down.  They cuffed him, while other guards cleared the

---

supporting exhibits.  If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute.

      Plaintiff's version of many of the events at issue is supported by only his own statements in his verified complaints and other court filings.  Because Plaintiff is a *pro se* litigant and those documents were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, I must consider them as equivalent to statements in an affidavit.  Parkell . Danberg, 833 F.3d 313, 320 n.2 (3d Cir. 2016); see also Ziegler v. Eby, 77 F. App'x 117, 120 (3d Cir. 2003) (noting that a verified complaint may qualify as an affidavit); Brown v. Dow, No. 08-cv-4330, 2011 WL 5080179, at *2 (D.N.J. Oct. 25, 2011) ("[A] *pro se* prisoner's signed and dated complaint, made under penalty of perjury, qualifies as a verified complaint, which may be treated as an affidavit in opposition to a motion for summary judgment under Federal Rule of Civil Procedure 56, to the extent it sets forth specific facts based on personal knowledge.").

remainder of the prisoners from the area.  (Id.)  Defendant Sergeant John Zuber arrived and placed a knee on Plaintiff's right knee to keep him from kicking.  (Id.; Def.'s Ex. D, Zuber incident report.) Officer Dean walked off, accompanied by another guard, with an apparent face injury.  (Def.'s Ex. A; Def.'s Ex. F, Watty incident report.)  The guards then stood Plaintiff up, brought a chair into the middle of the room, and sat him down, with one guard resting a hand on Plaintiff's shoulder.  After several minutes in which guards appear to be talking, four officers calmly escorted Plaintiff out of the room. The video stops at this point.  (Def.'s Ex. A.)

According to the incident reports, Plaintiff was escorted to 3C (the hole) by Defendants Zuber, Watty, and Hornick.  (Def.'s Exs. D, E, F.)  While being escorted, Defendant Zuber asked Plaintiff if he wanted to see medical about the spray, but Plaintiff declined.  (Def.'s Ex. D.)  Once in 3C, Officer Watty claims that he conducted an unclothed search of Plaintiff and then secured him in a cell without further incident.  (Def.'s Exs. D, E, F.)  According to Plaintiff, however, he was placed in a chair in the hallway, which is an area free of cameras.  Sgt. Kowal arrived, opened a locker, and handed out CERT (Correctional Emergency Response Team) padded gloves to the staff present.  Sgt. Kowal then ordered Plaintiff to stand up.  When Plaintiff stood, still handcuffed, Sgt. Kowal punched him in the stomach, asking "did [he] like hitting a member of their gang?"  Zuber punched Plaintiff in the back of the head, and Plaintiff fell to the ground.  While on the ground, Zuber took "some hand held device" out of the locker and held it to Plaintiff's right arm, shocking him with electricity.  Kowal, Zuber, Watty, and Hornick then proceeded to punch and kick Plaintiff in the head, back, legs, and arms repeatedly.  At some point, according to Plaintiff, their supervisor, Lt. Dailey, came in, saw what was happening, kicked Plaintiff in the shin, and said to remember Deputy Warden McFadden's orders, "no marks."  Finally, Kowal started choking Plaintiff, causing him to black out until Dailey said, "enough."  Plaintiff awoke to Kowal slapping him in the face.  Defendants Watty and Hornick stood Plaintiff up and fixed his clothes, and Watty told him to straighten up or he would get more.  He was taken to his cell, and a nurse came on the block to "decontaminate" him. (Sec. Am. Compl. ¶¶ 12–17.)

In support of his version of the events, Plaintiff presents a Declaration from two other inmates. One inmate stated that, on September 9, 2019, he heard Defendant Kowal say to Plaintiff "show your fucking identification or you'll get the same treatment you got in the 3C hallway." Another inmate attested that, on September 10, 2019, he also heard Defendant Kowal tell Plaintiff, "Keep it up and you're gonna get what you got in 3C hallway." When Kowal left, Plaintiff relayed to the inmate the story of how he was beaten in the 3C hallway while handcuffed. (Pls.' Ex. I.) Plaintiff also offers a response to his grievance about the incident, which notes that Plaintiff was seen in medical on July 22, 2019, several days after the incident, and x-rays revealed no fractures or dislocation. In addition, although the nurse noted some scratches and a brush burn, Plaintiff told the nurse that he was fine and he had no knee pain. (Pl.'s Ex. J.)

## B. **Events of June 2020**

Plaintiff's Second Amended Complaint next alleges that on June 24, 2020, Plaintiff and two inmates, Taiton Edwards and Duane Quonnis—both known, dangerous gang members—were yelling through their cell door at Plaintiff, threatening him. Neither C.O. Woodard nor C.O. Holler, both of whom were present, wrote any misconducts. Once locked in his cell, Plaintiff heard Holler tell Edwards and Quonnis, "he likes to assault guards, so he should be assaulted." Quonnis said to Holler and Woodard, "don't worry I got him tomorrow." Edwards then said, "if I see him upstate, I will stab him and if I see him in the tail, I will get him, you know C.O. Dean is my boy." In response, Holler said, "Don't worry, I'll make sure you will get your job back and you won't lose anything." (Sec. Am. Compl. ¶¶ 24–26.) Woodard and Holler failed to do anything to stop this potential assault. (Id. ¶¶ 27–29.) Plaintiff also alleges that prior to the June 25, 2020 assault, Defendants Russell, Miller, and McFadden knew Plaintiff's life was in danger due to several grievances he wrote. His complaints went uninvestigated, his request for transfer was denied, and his grievances were dismissed. (Pls.' Ex. A.)

The next day, Defendant Officer Jeff Henning was escorting Quonnis in from the yard. (Def.'s Ex. H.) As can be seen in the surveillance video of the events, Defendant was working at the e-law

library cart.  When Quonnis entered the doorway, he pulled away from Henning and charged Plaintiff.  The library cart was knocked over, and Henning chased after Quonnis.  (Def.'s Exs. H, I.)  Sergeant Gonzalez and Officer Kemmerer, both of whom were at the control booth, witnessed Henning tackle and secure Quonnis.  (Def.'s Ex. J.)  The video reveals that Quonnis was near or in contact with Plaintiff for under five seconds before Henning secured Quonnis by the stairway.  (Def.'s Ex. I.)  Henning then escorted Quonnis to his cell.  (Id.; Def.'s Ex. J.)  Sgt. Gonzalez observed blood dripping down Plaintiff's arm and elbow, although it is unclear how he was cut.  (Def.'s Ex. J.)  Plaintiff was treated by Nurse Scroggin and then brought to medical where he was examined, given a band aid, and returned to his cell.  (DSUF ¶¶39–41.)

### C.  Conditions of Confinement Claim

Finally, Plaintiff alleges that the conditions of confinement at the Lehigh County Department of Corrections/Lehigh County Jail violated constitutional standards.  In his Second Amended Complaint, Plaintiff made the following assertions:

- To punish inmates for going to the hole, clothing is reduced.  In population, inmates get multiple uniforms, pairs of underwear, socks, etc.  Once in the hole, those items are significantly reduced, books are removed, and inmates must wear short-sleeved jumpsuits.

- When going to the yard, which allows air, rain, and sunlight through, inmates are only allowed to wear shower shoes.  As a result, many often refuse the yard and stay in their cells for twenty-four hours.

- Since being in Block 3C, there has been an increase in the mouse infestation.

- Inmates in 3C get mats, not mattresses, and at least 90% of them are ripped and dirty.

- Showers in 3C have black mold.  No regular cleaning of showers is done.

- Food is used as a punishment.  On 3C, inmates are not given milk or juice, and they are given oil-based cheese and canned fruit.  Often, the bread is placed on top of the canned fruit, which makes the bread soggy and inedible.  At least three times a week, inmates are fed eggs and raw potatoes.  Beans are served five times a month, and many times they are raw.  Portion sizes are far too small to satisfy anyone.

- Inmates are not given adequate cleaning supplies to clean their cells and, thus, they are subjected to cells with urine and feces on the walls from years past.

(Sec. Am. Compl. ¶¶ 42–52.)

In support of his claims, Plaintiff offers the identical "Sworn Affidavit Declaration" from nine different inmates that states:

1. All male inmates at LCJ are issued 3 uniform shirts, 3 uniform pants, 4 underwear, 4 undershirts, 4 pairs of socks, 1 sweat shirt, 2 towels, 2 sheets, 1 pillow case and 2 blankets.  Once assigned to 3C you are allowed 1 uniform shirt, 1 uniform pants, 1 underwear, 1 undershirt, 1 pair of socks, 1 towel, 1 sheet, 2 blankets.  Despite on all other blocks you are allowed to retain the above amounts, along with your shoes, on 3C these amounts are contraban[d], as well as your shoes and your tee shirt on disciplinary status, which they take our pants, shirt and undershirt and give you a short sleeve jump suit on disciplinary status.

2. On 3C Monday, Wednesday and Friday is laundry exchange for which you do a one for one exchange of clothing and towel.  Rather then like population where you have your personal laundry bag that is washed and you have your clothes returned.  Often, there is not enough clothes or towels to meet the population needs and we go additional days, even a week without clean clothes or a towel.  Even when we do get laundry exchange we are often forced to exchange for socks that are often holes in them, under clothes with various stains in them and old worn out towels.

3. Despite the prison being cold, cold air blowing forcefully through the vents, our clothes are reduced and we are forced to suffer freezing temperatures.

4. We are forced, in the winter, to go in the yard with slippers and one pair of socks, often having our feet freeze until numb and we are force[d] to come back in in less than our allotted time.  Other than that we must stay in our cell 24 hours a day if we don't go outside under these conditions.

5. Once on 3C we are given 1 inch mats that has covers that are ripped, worn, filthy and known to be so by the COs and their supervisors as they put us in the cells and nothing is done about it.

6. Monday through Sunday a medical person comes around with a C.O. and a person from the psychology department.  The medical person ask if we need anything from medical or psychology department, but always say fill out a sick call slip and leave.  The person from the psychology department never says anything and if you ask her anything, she says fill a call slip out.

7. I have experienced or witness[ed] members of the psychology department coming to people's door when they come to see people and

discuss my or other people's mental health condition in front of the C.O. and loud enough to be heard by other inmates on the block.

8. I have witness[ed] or experience[d] other inmates using what they heard through those conversations and taunt myself or others with that confidential information, including Mr. Williams was taunted.

9. On 3C1, there are several panels that have water damage, one has black stuff that appears to be mold and mold in the showers.  The mold on the ceilings are next to vents that blow air on the block and we, staff and inmates, are subject to breathing this 24 hours a day.

10. Despite population having milk and juice, on 3C we are denied both and given an oil base substitution with applesauce or some other canned fruit which often one or both slices of bread are put in, forcing us to have to discard this bread most meals, denying us our recommend[ed] daily calorie intake as well as making us constipated from eating cheese every day.

11. We are also fed eggs and potatoes six days a week and often are fed uncooked beans and other food on a regular bas[i]s.

12. Once on disciplinary status, aside from your clothing being further reduce[d], your reading books and other material are removed and you are given a bible if you are religious, from your property.  Other than that you are not allowed reading material or/and dictionaries.

13. On 3C there is a mice problem where mice are running in and out of the cells, no staff has brought any mouse traps on the block and no exterminator has come to address the problem.  The only mouse traps are in the hallway to 3C1 and 3C2, where staff control is off the block, none on the block.

14. Once on disciplinary status you no longer have access to the law library. You must write to the counselor supervisor and request the exact legal cases you need, cites that if you don't have in your head you cannot produce.  Therefore, we cannot file writ of habeas corpus to challenge your conditions of confinement at the time we experience them and once off 3C, the issue is moot.  Thus, we are denied the right to pursue l[e]gitim[ate] issues.

15. Once on 3C you are no longer allowed to cover your upper body to go to the shower.  In population this is mandatory.  On 3C unless you are a transexual, you cannot cover your top body with clothes going to and from the shower.  You therefore tend to be the subject of sexual tau[n]ts by other inmates, as I have witness, experience and Mr. Williams has been subject to on numerous occasions.

16. In the hallway of 3C1 and 3C2, by the control area is an area when you sit for misconducts, JRC hearing and to wait to go to various places.  This area is also where inmates are both manhandled and assaulted by guards.  I have witness, heard or experience this.  This is a well known area in the prison and despite new cameras being placed in the prison, there still hasn't been none placed in this area to help monitor staff behavior and thus it goes unchecked, with assaults continuing.

(Pl.'s Ex. B.)  In addition, Plaintiff includes the affidavit of one inmate who states that, while on 3C, he has been given uncooked beans on a number of days of the week, and from another inmate who attests that those inmates on special diets are given raw, uncooked food several times a week.  (Id.)

To rebut Plaintiff's conditions of confinement claim, Defendants produce two letters.  The first, dated July 17, 2019, shows that the Lehigh County Department of Corrections earned full compliance during the 2019 inspection period.  The inspection was conducted on June 20, 2019 and showed "full compliance" which "is a distinction that is earned when a facility and staff have met or exceeded Title 37, Chapter 95 expectations." (Defs.' Ex. M.)  This rating exempted the Lehigh County Department of Corrections from the normal one-year inspection cycle, meaning it would next be inspected in 2021.  (Id.)  The second letter, dated August 15, 2022, showed that the Lehigh County Department of Corrections/Lehigh County Jail earned full compliance during the 2022 inspection period.  The inspection occurred on July 19, 2022, and the results of the inspection also showed "full compliance." (Id.)  Plaintiff asserts that these letters do not address the conditions complained of between July 16, 2019 and February 7, 2020.

Defendants also show that the Lehigh County Department of Corrections/Lehigh County Jail maintains policies and standards regarding housing and clothing, including inspections of housing unit areas for cleanliness, appropriate bedding/mattresses, and clothing.  (Def.'s Ex. N.)  The Lehigh County Prison Disciplinary Segregation housing unit policy delegates cleaning tasks to inmates to be overseen by a Housing Unit Officer responsible for supervising the assignments and ensuring that the areas are kept in a state of cleanliness and sanitation, including floors and walls.  (Id.)  It further requires that inmate workers thoroughly clean showers after usage, after which work is inspected by the Housing Unit

Officer, and that general cleaning is done every Saturday, including areas under bunks, in toilets and

sinks, railings, stairways, windows, showers, yard, etc., all of which is inspected and documented by the

Housing Unit Officer.  (Id.)

Defendants also provide the Affidavit of Warden Kyle Russell, who attests to the following:

- Lehigh County Department of Corrections/Lehigh County Jail follows nutritional standards approved by a dietitian for all inmates.

- Plaintiff's laundry was supplied pursuant to the Laundry Policy in conjunction with the Segregation Housing Unit Policy.

- During 2019, footwear for inmates was in the form of "sandals" for use in the recreation yard.  As of 8/1/20, all inmates in the jail were issued "crocs" for use in the dayroom and recreation yard.  During inclement weather and cold temperatures, inmates have the option of a hat and coat.

- The showers and housing units are regularly inspected for cleanliness pursuant to the prison housekeeping policy.

- The jail contracts with an extermination service for inspection on a regular basis.

(Def.'s Ex. P.)  In addition, Warden Russell stated that he personally toured the area of 3C in the jail

during the year complained of by Plaintiff and the areas were in complete compliance with the prison's

policies, with no evidence of rodent infestation, mold in showers, or undocumented issues regarding

cleanliness.  (Id.)

Finally, as to Plaintiff's allegations regarding clothing, Defendants provide a copy of the Lehigh

County Department of Corrections/Lehigh County Jail Laundry Policy.  (Defs.' Ex. O.)  This policy

includes the following procedures:

- The Laundry Officer oversees all facets of the jail laundry operations, including supervising inmate workers, operating washers and dryers, answering requests for shortages, forwarding cups and spoons to the kitchen for sanitation, and collecting and delivering laundry according to the current schedule.

- The Laundry Officer ensures that clothing and linens are laundered before re-issue and that clothing and linens are laundered at least weekly.

- The Laundry Officer ensures that daily maintenance of machines is performed.

- The Laundry Officer directs and supervises inmates in the laundry housekeeping details including cleaning, mopping, dusting, etc.

- The Laundry Officer coordinates with the Warehouse Utility and A&D Officers to maintain an adequate stockage of uniforms and linens.

- The Housing Unit Officers designate a housing unit worker and supervise the worker to collect and distribute laundry according to the current schedule.

- The Housing Unit Officers collect and return to laundry any extra clothing from discharged inmates for redistribution.

(Defs.' Ex. O.)  Pursuant to the laundry schedule, inmates have their laundry collected and cleaned three days a week.  (Id.)

### D. Procedural History

On June 4, 2020, Plaintiff filed his Complaint alleging state law claims of assault and battery, as well as claims under 42 U.S.C. § 1983 for excessive force, denial of access to courts, and violations of his First and Fourteenth Amendment rights.  On August 18, 2020, Plaintiff filed an "Amended Complaint" setting forth additional claims related to the June 2020 incident.

On March 1, 2021, the Prison Defendants moved to dismiss the claims against them.  I granted Defendants' Motion as to the conditions of confinement claim against Defendant Russell, the First Amendment claim, the Equal Protection Clause claim, and the state law claims against Defendants Miller, Russell, McFadden, and Henning.  I also granted Plaintiff leave to file a second amended complaint.

Plaintiff timely filed the Second Amended Complaint alleging:  (1) excessive force and assault and battery against Defendant Dean; (2) excessive force, assault and battery, and conspiracy against Defendants Dailey, Zuber, Kowal, Watty, Hornick, and McFadden; (3) failure to protect, assault and battery, and negligence against Defendants Holler, Woodard, Quonnis, and Henning; (4) failure to protect and Eighth Amendment violations against Defendants Russell, McFadden, and Miller; (5) conditions of confinement violations against Defendants Russell, McFadden, and Miller; and (6)

discrimination in violation of the Fourteenth Amendment against Defendants Russell, McFadden, and Miller.

The Prison Defendants again moved to dismiss. On February 10, 2022, I dismissed all claims against Defendant Henning and all claims under the Equal Protection Clause of the Fourteenth Amendment but denied the motion on all other grounds. The parties have proceeded through discovery, and the remaining Defendants seek summary judgment on all claims against them.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue, in rebuttal. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment is appropriate if the non-moving

party provides merely colorable, conclusory or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252.  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

"[O]n a motion for summary judgment, a *pro se* plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment."  Edwards v. Rice-Smith, 606 F. Supp. 3d 151, 154 (E.D. Pa. 2022) (quoting Dawson v. Cook, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017)).  "The party opposing summary judgment, whether pro se or counseled, must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial."  Id. (quoting Watson v. Philadelphia Hous. Auth., 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009)).

## III.   DISCUSSION

### A.   Excessive Force Claims

For a pretrial detainee[3] to state an excessive force claim against a prison official, he must allege that the force used was applied "maliciously and sadistically to cause harm" and not "in a good-faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. 1, 7 (1992).  An inmate does not have to show that the harm suffered was sufficiently serious in order to make out a constitutional violation where excessive force was used, and absence of serious injury, while relevant, does not end

---

[3]    Defendants seek dismissal of Plaintiff's excessive force claims to the extent they are brought under the Eighth Amendment because Plaintiff has identified himself as a pretrial detainee from February 7, 2019 through February 7, 2020.  Plaintiff, however, appears to have brought his claims under the appropriate vehicle of the Fourteenth Amendment.  To the extent he asserts any claims under the Eighth Amendment, judgment will be granted in favor of Defendants on those claims.

the inquiry.  Id. at 7; see also Brooks v. Kyler, 204 F.3d 102, 104 (3d Cir. 2000) ("Following Hudson's focus on the force used, as opposed to the injury inflicted, we conclude that although the degree of injury is relevant for any [constitutional violation] analysis, there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for wanton and excessive force").  The test is objective only, there is no subjective component. Jacobs v. Cumberland Cnty, 8 F.4th 187, 194 (3d Cir. 2021).

Whether a defendant used objectively unreasonable force requires careful attention to the facts and circumstances of each particular case.  Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. at 194–95 (quotations omitted).  The court must analyze these circumstances "from the perspective of a reasonable officer on the scene."  Id. at 195.  The United States Supreme Court has acknowledged that running a jail is "an inordinately difficult undertaking."  Turner v. Safley, 482 U.S. 78, 84–85 (1987). "Safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."  Kingsley v. Hendrickson, 576 U.S. 389, 399 (2015) (quoting Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 326 (2012)).  Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."  Id. (internal quotation marks omitted) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (quotations and internal quotation marks omitted).

1.  Events Occurring in General Population on July 16, 2019

Plaintiff's first excessive force claim asserts that, while he was talking on the phone in general population, he was unnecessarily attacked and punched in the throat and ribs by Defendant Dean.

13

Thereafter, Defendants Zuber, Kowal, Dailey, and Dean jointly attacked Plaintiff, sprayed him with pepper spray, and tightly handcuffed him.

When the events at issue are captured on video, a court must consider that evidence in determining whether there is any genuine dispute as to a material fact. See Scott v. Harris, 550 U.S. 372, 379–81 (2007). "Where, as here, the events at issue are captured on video and 'opposing parties tell different stories, one of which is blatantly contradicted by the record,' the Court must view the facts 'in the light depicted by the video[].'" White v. Gonzales, No. 22-cv-1226, 2023 WL 6144846, at *2 (E.D. Pa. Sept. 20, 2023) (quoting Scott, 550 U.S. at 380–81).

Here, based on the video evidence capturing the events with Defendant Dean, I find that no reasonable juror could conclude that excessive force was used. As noted above, Plaintiff can be seen talking on the phone until another inmate walks by, and Plaintiff drops the phone and begins aggressively speaking to the other inmate at close range. Defendant Dean, standing at a reasonable distance, confronts Plaintiff about his behavior, and Plaintiff returns to his phone call. As Officer Dean continues to talk, Plaintiff again drops the phone and starts charging at Dean with his fists in the air. Dean appears to throw the first punch, but Plaintiff continues to take an aggressive stance holding his fists as if ready to strike. The two men briefly scuffle until multiple other guards intercede and bring Plaintiff to the ground face down, with one officer allegedly spraying something in Plaintiff's eyes and face. Plaintiff is cuffed, held for a brief period on the ground, and then seated in a chair in the middle of the room, with one guard resting a hand on Plaintiff's shoulder. No additional force is used, and, after several minutes four officers calmly escort Plaintiff out of the room.

Nothing in this undisputed set of facts allows for any finding of excessive force. The video reflects that Plaintiff instigated the events, first by aggressively confronting another inmate and next by charging at Dean. Dean's response was simply an effort to temper the situation and avoid injury to others around him. In addition, the video clearly portrays the other guards' use of minimal force to subdue and calm Plaintiff. Although Plaintiff claims that pepper spray was used on him, district courts

in this Circuit have routinely found the use of pepper spray a reasonable use of force in response to a physically resistant pretrial detainee. <u>See</u> <u>White</u>, 2023 WL 6144846, at *3 (E.D. Pa. 2023) (citing <u>Spada</u> <u>v. Houghton</u>, 20-cv-223, 2022 WL 4280519 at *3 (W.D. Pa. Jul. 22, 2022) and <u>McCamey v. Craig</u>, No. 15-cv-1108, 2016 WL 5816821 at *4 (W.D. Pa. Oct. 5, 2016).   Accordingly, I will grant summary judgment in favor of Defendants on this claim.

2.   <u>Events Occurring in the "Hole" on July 16, 2019</u>

The second set of events on which Plaintiff premises his excessive force claim occurred immediately after the foregoing confrontation when Plaintiff was taken to the "Hole."  According to Plaintiff, once escorted out of general population, he was placed in a chair in the Block 3C hallway, which is an area free of cameras.  Plaintiff claims that Defendants Kowal, Zuber, Watty, Hornick, and Dailey then proceeded to beat, tase, and choke him, while he was still handcuffed, causing him to black out.

Defendants respond that Plaintiff's bare assertions, without additional supporting evidence fail to establish his claims. Defendants also point to the incident reports of Defendants Zuber, Watty, and Hornick that stated that, once in the 3C hallway, Plaintiff was subject only to an unclothed search and then secured in a cell without further incident.  Finally, Defendants contend that there is a lack of medical evidence that Defendants acted maliciously and sadistically.

Defendants' evidence, however, fails to eliminate any genuine issue of material fact on this issue. Defendants have not provided any affidavits or deposition testimony from the allegedly offending officers regarding their version of the events.  Indeed, even if they had, Plaintiff's own recitation of the facts would simply create a credibility issue.  Accordingly, I decline to grant summary judgment on this claim.

**B.** **<u>Failure to Protect Claim</u>**

Plaintiff's final excessive force claim involves an incident on June 25, 2020, when Officer Jeff Henning was escorting inmate Duane Quonnis in from the yard.  (Def.'s Ex. H.)  The surveillance video

15

of the events showed Defendant working at the e-law library cart, when Quonnis entered the doorway, pulled away from Henning, and charged Plaintiff, knocking over the library cart.  Henning chased after Quonnis, tackled him, and secured him.  The whole event lasted under five seconds.  Plaintiff alleges that on the day prior to these events, June 24, 2020, Defendants Holler and Woodard heard Quonnis threaten Plaintiff but failed to report him.  (PSUF ¶ 7.)

It is well settled that prison officials have a duty to "take reasonable measures to protect prisoners from violence at the hands of other prisoners."  Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)).  Inherent in that duty is the obligation to not incite violence against a prisoner by other inmates.  See Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992) (overturning Rule 12(b)(6) dismissal of complaint alleging that prisoner was beaten by inmates because a guard told them the prisoner was a "snitch"; allegation that guard intended to harm prisoner by inciting other inmates to beat him states a claim); Miller v. Coning, No. 11-cv-377, 2011 WL 2708649, at *3–4 (D. Del. July 12, 2011) (declining to dismiss prisoner's allegation that guards labeled him a "snitch," after which he was beaten by other inmates).  To establish a failure-to-protect claim, a prisoner must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm.  Jones v. Beard, 145 F. App'x 743, 735 (3d Cir. 2005).  An official acts with deliberate indifference if he or she knows of and disregards a substantial risk of serious harm to inmate health or safety.  Id.

Defendants now seek summary judgment on Plaintiff's failure to protect claim as to Defendants Henning, Holler, and Woodard.

As to Defendant Henning, Plaintiff has put forth no evidence that Henning knew about safety concerns with Quonnis.  Moreover, the surveillance video clearly shows Quonnis freeing himself from Henning's grip following which Henning immediately pursues Quonnis, tackles him, and secures him

to ensure that he cannot further attack Plaintiff.  Given these undisputed events, no reasonable jury could find Henning liable for failure to protect.

As to Defendant Woodard, Plaintiff alleged in his Second Amended Complaint that Woodward overheard the argument between Plaintiff and inmates Quonnis and Edwards, but did nothing—either by writing a misconduct report or warning the first shift staff about the threat—to protect Plaintiff.  Such bare allegations absent more, while enough to survive a motion to dismiss, are insufficient at the summary judgment stage for a reasonable juror to find that Defendant Woodard knew of a serious threat of harm to Plaintiff yet was deliberately indifferent to that risk.  Accordingly, I will grant summary judgment in favor of Defendant Woodard.

As to Defendant Holler, Plaintiff presents evidence—in the form of both his own allegations and a corroborating affidavit from another inmate—to suggest that Holler's actions went beyond mere verbal harassment.  (Pl.'s Ex. K.)  Following an argument between Plaintiff and inmates Quonnis and Edwards, during which Quonnis and Edwards threatened to attack Plaintiff, Plaintiff allegedly heard Holler tell Quonnis, "he likes to assault guards, so he should be assaulted."  In response, Quonnis replied, "don't worry I got him tomorrow," and Edwards stated, "if I see him upstate, I will stab him and if I see him in the jail, I will get him, you know Dean is my boy."  C.O. Holler then said, "don't worry, I will make sure you get your job back and you won't lose nothing."  Subsequently, Plaintiff was attacked by Quonnis, after which Holler went to Quonnis's cell to congratulate him.

Such sworn statements taken in the light most favorable to Plaintiff could suggest that Holler was not only deliberately indifferent to a known and substantial risk of serious harm to Plaintiff, but that Holler actually took affirmative action to encourage that violence.  Defendants have not met their summary judgment burden of establishing that no genuine issue of material fact exists as to these events.

Given that a reasonable jury could find in favor of Plaintiff on this claim, I will deny Defendants' Motion for Summary Judgment as to Holler.[4]

> **C.**     **Section 1983 Claims Against Defendants Russell, McFadden, and Miller Related to the Events on July 16, 2019 and June 24, 2020**

In order to prevail on a § 1983 claim against a supervisor, a plaintiff must show either that (1) the supervisor directly participated in violating a plaintiff's constitutional rights, (2) that he directed others to do so, or (3) as the officer in charge, the supervisor had knowledge of and acquiesced in constitutional violations committed by subordinates. Zimmerman v. Schaeffer, 654 F. Supp. 2d 226, 253 (M.D. Pa. 2009) (citing Beers–Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001)). A plaintiff may also establish supervisory liability by showing that a supervisor tolerated past or ongoing misbehavior by subordinates:

> The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001).

As to Russell and Miller's supervisory liability, Plaintiff asserts that, prior to the June 25, 2020 assault, they knew Plaintiff's life was in danger based on his grievances, but his complaints went uninvestigated, his request for transfer was denied, and his grievances were dismissed. (Pl.'s Ex. A.) Plaintiff's evidence, however, simply states that he filed two grievances in March 2020 that he feared for his life. He did not identify any specific fears regarding Quonnis. It is well established that the "out-of-the-blue and unadorned 'I'm-in-trouble' entreaty that is commonly faced by officials, who are

---

[4]     Defendants also move for summary judgment on any conspiracy claim between Defendants Holler, Woodard, and Henning. In his Response, however, Plaintiff confirms that he is not alleging any conspiracy claim. (Pl.'s Resp. Opp'n Summ. J. 14.)

charged with the 'arduous' task of managing an inmate population while protecting those in custody," is insufficient to allege deliberate indifference.  Blackstone v. Thompson, 568 F. App'x 82, 84 (3d Cir. 2014) (internal citations and quotations omitted) (finding plaintiff's complaint to officer that he was not "getting along" and did not "feel comfortable" with his cellmate, who had a history of violence, insufficient to state a claim of deliberate indifference when cellmate attacked plaintiff).  As there is no evidence from which a reasonable jury could find that Russell and Miller were aware  of any excessive risk from Quonnis to Plaintiff's safety, I will grant summary judgment in their favor on these claims.

As to supervisory liability against Defendant McFadden, however, Plaintiff avers that McFadden knew that assaults would happen in the hallway where Plaintiff was beaten, has witnessed and participated in assaults in this area, and has purposefully kept this area a "blind spot" from the cameras. Further, Plaintiff attests to the fact that McFadden directly controls and directs Defendants Dailey, Kowal, and Zuber to assault inmates, and then attempts to cover up these actions.  Indeed, Plaintiff contends that, during the July 2019 assault, Dailey was present, struck Plaintiff, and explicitly warned the other officers to remember Deputy Warden McFadden's orders of "no marks."

Based on this evidence, a reasonable jury could find that McFadden had a policy of directing officers to "punish" inmates in the 3C hallway where there were no cameras and to do so in a way that would avoid scrutiny.  Accordingly, I decline to grant summary judgment on this claim.

### D.  Conditions of Confinement Claims

Defendants next seek summary judgment on Plaintiff's conditions of confinement claim.  "A pretrial detainee's protection from punishment under the Fourteenth Amendment has been distinguished from a convicted prisoner's protection from punishment that is 'cruel and unusual' under the Eighth Amendment."  Hall-Wadley v. Maintenance Dept., 386 F. Supp. 3d 512, 516 (E.D. Pa. 2019).  The Third Circuit has held that pretrial detainees "are entitled to greater constitutional protection than that provided by the Eighth Amendment."  Hubbard v. Taylor, 399 F.3d 150, 167 n.23 (3d Cir. 2005). When a pretrial detainee claims that the conditions of confinement violate his due process rights, "the proper inquiry

is whether those conditions amount to punishment of the detainee." <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979).  The United States Supreme Court established a two-prong standard for determining whether conditions of confinement violate Due Process: whether the questioned "restrictions and practices" (1) "are rationally related to a legitimate nonpunitive governmental purpose[,]" and (2) "whether they appear excessive in relation to that purpose."[5] <u>Id.</u> at 561.

In support of his conditions of confinement claim, Plaintiff offers the identical affidavit from nine different inmates[6] claiming that individuals on disciplinary status receive only a short sleeve jumpsuit, are forced to suffer freezing temperatures with cold air blowing through the vents, must go in the yard with only slippers or a pair socks, sleep on ripped and dirty one-inch mats, endure black mold on the air vents and the showers, have limited and unvaried food intake leaving them hungry, are deprived of reading materials and access to the law library, lack access to mental health treatment, and endure mice running in and out of the cells.

"Conditions . . . alone or in combination[ ] may deprive inmates of the minimal civilized measure of life's necessities." <u>Mammana v. Federal Bureau of Prisons</u>, 934 F.3d 368, 373 (3d Cir. 2019) (quotations omitted).  Some conditions of confinement may violate the constitution "'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." <u>Id.</u> at 373–74 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1991)).  For example, where inmates face a low cell

---

[5]     Although the Eighth Amendment does not apply to pretrial detainees, the substantive due process guarantees afforded by the Fourteenth Amendment "are at least as robust as Eighth Amendment protections afforded prisoners." <u>Hope v. Warden York Cnty. Prison</u>, 972 F.3d 310, 325 (3d Cir. 2020).  That being said, much of the Third Circuit's jurisprudence on the Fourteenth Amendment has been informed by the Eighth Amendment. <u>Andrews v. Harper</u>, 576 F. Supp. 3d 305, 312–13 (W.D.Pa., 2021); <u>Hammonds v. Allegheny Cnty. Bureau of Corr.</u>,. 18-cv-1389, 2019 WL 3802064, at *2 (W.D. Pa. Aug. 13, 2019) (Eddy, M.J.) ("[W]hen analyzing conditions of confinement claims for pre-trial detainees, courts utilize the jurisprudence developed under the Eighth Amendment.").

[6]     These were all filed under penalty of perjury and, thus, satisfy the affidavit requirement of Federal Rule of Civil Procedure 56.

temperature at night along with a failure to issue blankets, they may be deprived of the human need for sleep.  Wilson v. Seiter, 501 U.S. 294, 304 (1991).

Nonetheless, prison conditions may be harsh and uncomfortable without violating the constitutional minimums.  Farmer v. Brennan, 511 U.S. 825, 833–34 (1994).   The prisoner plaintiff bears the burden of proving that the challenged condition is "extreme" and "pose[s] an unreasonable risk of serious damage to the [prisoner's] future health or safety."  Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotation marks and citation omitted).  Stated differently, "[a] plaintiff must show that the conditions to which he is exposed pose a risk of serious harm to the prisoner; a risk so serious that society is unwilling to tolerate it."  Rambert v. Horn, No. 96-cv-2875, 1996 WL 583155, at *2 (E.D. Pa. Oct. 11, 1996).

Here, the conditions detailed by Plaintiff, while uncomfortable, are not so harsh as to violate the Fourteenth Amendment.  Courts have repeatedly held that sleeping on floor mattresses does not violate the Eighth or Fourteenth Amendments where there is no evidence that the practice has caused harm.  See, e.g., Lindsey v. Shaffer, 411 F. App'x 466, 468 (3d Cir. 2011); Baez v. Froehlich, No. 20-cv-149, 2021 Wl 4341191, at *9 (W.D. Pa. Sept. 23, 2021) (allegation of a one-month mattress restriction or deprivation is not sufficient to state a conditions of confinement claim); Stevenson v. Quiros, No. 21-cv-234, 2023 WL 2240287, at *5 (D. Conn. Feb. 27, 2023) (holding that providing an inmate with a thin mattress is not, by itself, a constitutional violation).

Moreover, the other conditions alleged by Plaintiff do not rise to the level of a constitutional violation.  See, e.g., Wilks v. City of Philadelphia, No. 18-cv-4087, 2019 WL 4261159, at *5 (E.D. Pa. Sept. 6, 2019) (plaintiff's concerns with his bedding, food, showers, and stagnant water over a six month period do not rise to the level of inhumane); Wheeler v. Walker, 303 F. App'x 365, 368 (7th Cir. 2008) (rejecting Eighth Amendment claim where prisoner alleged no serious harm resulting from a two week period where he had only a thin blanket to protect him from frigid area entering unheated cell through window with broken latches, roaches crawled over him while he tried to sleep on badly torn mattress,

urine and waste "encrusted" sink and toilet, trash, dirt, and debris covered floors, walls, and sink, and stench of waste came from broken toilet); Alfred v. Bryant, 378 F. App'x 977, 980 (11th Cir. 2010) (holding that sleeping on an unsanitary eating table or on a dirty mattress on the floor did not violate an inmate's Eighth Amendment rights, even when considered in conjunction with plaintiff's allegations of inadequate medical care and unsanitary food service).

Finally, Plaintiff has not shown that any Defendant knew of and failed to act on the knowledge of these conditions. To prevail on a Fourteenth Amendment claim brought pursuant to § 1983, a pretrial detainee must also demonstrate that a particular defendant acted with "deliberate indifference" to those conditions. Edwards v. Northampton Cnty, 663 F. App'x 132, 135 (3d Cir. 2016). Deliberate indifference is established if a defendant "knows that inmates face a substantial risk of serious harm" and "disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).

Plaintiff offers no evidence that McFadden or Miller were aware of the conditions and condoned them, and, as such, they are entitled to summary judgment. As to Defendant Warden Russell, Plaintiff produces a single grievance from July 26, 2019, in which Plaintiff claimed that he "was moved to cell 3C2-14 and given a filthy ripped up mat that is super thin. I showed C.O Kareyon. She said that is the only ones they have access to. I should have to sleep on a filthy, germ infested mat that is ripped up. I request another mattress and $1 million." (Pl.'s Ex. C.) In response, Defendant Russell stated that Plaintiff never requested a new mattress from the C.O. but simply threatened to file a grievance, and that "video review does show that your mattress was replaced on 7/30/2019 at 1000 hours after you were removed from your cell." (Id.) Such a single grievance that was quickly remedied cannot establish deliberate indifference. Indeed, Defendants produce several inspections from the Lehigh County Department of Corrections showing that the prison earned full compliance during the inspection period.

As no genuine issue of material fact remains on the conditions of confinement claim, I will grant summary judgment in favor of Defendants on this claim.

**E.  State Tort Claims**

Finally, Defendants move for summary judgment on Plaintiff's remaining state law claims of assault and battery against Defendants Dailey, Zuber, Kowal, Watty, and Hornick.  Specifically, Defendants contend that these claims are barred under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. §§ 8501, et seq.

As I have noted previously, Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA") states that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa. Cons. Stat. § 8541.  This limitation extends to an employee of a local agency to the extent his acts were within the scope of his office or duties. Id. § 8545. Immunity is abrogated for negligent acts falling into one of eight proscribed categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals.  Id. § 8542(b).

With respect to intentional acts, however, section 8550 provides that with respect to governmental employees who by their misdeeds are determined to have "caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply."  42 Pa. Cons. Stat. § 8550. The United States Court of Appeals for the Third Circuit has recognized that "[e]mployees are not immune  from  liability  under  §  8545  where  their  conduct  amounts  to  'actual malice'  or  'willful misconduct.'"  Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006).  "Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such a desire

can be implied.'  Otherwise stated, the term 'willful misconduct' is synonymous with the term 'intentional tort.'"  Id. (quoting Renk v. City of Pittsburgh, 641 A.2d 289 (Pa. 1994)).

Defendants contend that they are immune from suit because Plaintiff has presented no evidence that they intended to commit any type of intentional tort.  Viewing the facts in the light most favorable to Plaintiff, however, I conclude that a reasonable jury could find that Defendants Dailey, Zuber, Kowal, Watty, and Hornick intentionally participated in an unwarranted beating of Plaintiff.  Therefore, I decline to dismiss these claims.

## IV.   CONCLUSION

For the foregoing reasons, I will grant summary judgment on the excessive force claim against Defendant Dean, the failure to protect claim against Defendants Henning and Woodard, and all claims against Defendants McFadden and Miller.  What remains are: (1) the excessive force claim against Defendants Kowal, Zuber, Watty, Hornick, and Dailey; (2) the failure to protect claim against Defendant Holler; (3) the supervisory liability claim against Defendant McFadden based on the June 2020 events; and (4) the state law assault and battery claims against Defendants Dailey, Zuber, Kowal, Watty, and Hornick.  An appropriate Order follows.